IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 16, 2021 Session

## MICAH ROSS JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 10700     G. Scott Green, Judge**

_____

### No. E2021-00294-CCA-R3-PC

_____

The petitioner, Micah Ross Johnson, appeals the denial of his petition for post-conviction relief, which petition challenged his 2011 convictions of first degree murder and especially aggravated robbery, alleging that he was deprived of the effective assistance of trial counsel.[1]  Because the petitioner has established that he is entitled to post-conviction relief, we reverse the judgment of the post-conviction court and remand the case for a new trial.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JILL BARTEE AYERS, JJ., joined.

Gregory P. Isaacs and J. Franklin Ammons, Knoxville, Tennessee, for the appellant, Micah Ross Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case comes to us following a remand to the post-conviction court for additional findings of fact and conclusions of law to facilitate our review.  *See Micah Ross Johnson v. State*, No. E2019-00491-CCA-R3-PC, slip op. at 13-14 (Tenn. Crim. App., Knoxville, Sept. 8, 2020).

---

[1]     The petitioner was represented by two attorneys at trial, and both attorneys testified at the post-conviction evidentiary hearing.  For the sake of clarity, we will refer to the trial attorneys together as "trial counsel" and individually as "lead counsel" and "co-counsel."

In 2011, a Knox County Criminal Court jury convicted the petitioner of one count of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery for the "brutal beating, slashing, and strangulation of [24]-year old Carrie Daughtry." *State v. Micah Johnson, Alias*, No. E2013-02356-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., Knoxville, Mar. 2, 2015). The evidence presented at trial showed that in the early morning hours of March 19, 2008, the petitioner parked his vehicle one block from the house that his girlfriend shared with the victim and that he attacked the victim as she returned home from her job at Barley's Taproom. *Id.*, slip op. at 2. The petitioner hit the victim in the head with a brick that he got from the backyard of the residence. *Id.*, at 17.

> After the [petitioner] broke the brick by striking the victim with tremendous force in the head, he did not end the assault but procured a second weapon from underneath the carport—the shovel—and proceeded to stab and mutilate the victim with it. He then retrieved yet a third weapon, either brought with him or in the same general location as the brick or the shovel, and attempted to strangle the victim with it. The attack on the victim lasted over ten minutes . . . ."

*Id.* The petitioner then "dragged the victim's body across the front yard to her vehicle parked on the street" and attempted to place her body in the vehicle but fled the scene when police arrived. *Id.*

Strewn across the yard, officers found "the victim's purse, a bloody jacket, and a single shoe. A bloody gray t-shirt and a bloody white t-shirt, a set of keys, and the other shoe were found in the grass close to the victim's SUV." *Id.*, slip op. at 6. The petitioner took the victim's cellular telephone "to keep her from summoning help," *id.*, slip op. at 17, and took $87 in cash that the victim had made in tips that night, *id.*, slip op. at 6. All three murder weapons were found at the scene with the "bloody shovel next to the victim's body and two blood-stained pieces of brick in the yard . . . . A rope was tied around the victim's neck." *Id.* "The victim suffered extensive wounds from all three of [the] weapons, some of which were defensive wounds inflicted while she was trying to protect herself." *Id.*, slip op. at 16.

After killing the victim, the petitioner returned to the house where he lived with his father and "immediately showered, changed clothes, and placed his bloody clothes inside a bag. He then left the house through a window, carrying the bag, and proceeded to get $500 cash from an ATM. He fled to Georgia but later returned to Tennessee." *Id.*, slip op. at 17.

Officers suspected the petitioner, and, "[d]uring the late evening hours of March 19, 2008," two officers attempted to effectuate a traffic stop on the petitioner, but he led the officers on "[a] short chase." *Id.*, slip op at 5. "Once on the Henley Street Bridge, the [petitioner] 'slammed on his brakes[,]' exited the car, ran to the side rail, and jumped up 'like he had intended to jump[,]'" but an officer was able to pull him from the edge of the bridge and take him into custody. *Id.*, slip op. at 5-6 (second alteration in original).

On direct appeal, this court reversed the petitioner's convictions of especially aggravated kidnapping and remanded for a new trial on those charges but affirmed the remaining convictions. *Id.*, slip op. at 1.[2]

The defendant filed a timely pro se petition for post-conviction relief on December 14, 2015. The post-conviction court appointed counsel, but the defendant retained private counsel before the evidentiary hearing and filed an amended petition, alleging multiple instances of deficient performance by trial counsel, including that (1) trial counsel performed deficiently in their "selecting, preparing, [and] presenting expert witness testimony" to support an insanity defense, (2) trial counsel failed to notify the petitioner of an inquiry by the Tennessee Board of Professional Responsibility ("BPR") into alleged misconduct by the prosecutor, (3) lead counsel represented the petitioner despite an actual conflict of interests, (4) trial counsel failed to object to evidence that the petitioner would not be subject to confinement if found not guilty by reason of insanity, (5) trial counsel failed to notify the petitioner that the trial judge had a conflict of interests, and (6) cumulative error.

At the October 3, 2018 evidentiary hearing, lead counsel testified that when selecting an expert witness, he routinely sought references from other experienced lawyers. Lead counsel agreed that his review of an expert's draft and final reports are material to the preparation of a defense. He said that it was his practice to review any draft report prepared by the expert, explaining, "Well, there's lots that the expert can get wrong. There's lots of material that the lawyer understands that the expert may in drafting the report miss. . . . . You just want to make sure that [the report is] as accurate as it can possibly be." He said it was also his practice to discuss with the experts any omissions or discrepancies in the draft report and ask them to "[c]hange their findings or their opinions." Lead counsel knew that a report prepared by an expert would be seen by the State.

Lead counsel testified that in his first meeting with the petitioner, the petitioner "was in real distress, and he was extremely psychotic" and "struggling mightily." He said that the petitioner "was clearly hearing things" and "was obviously physically

---

[2] The record does not indicate a further disposition on the petitioner's especially aggravated kidnapping charges.

trying to resist whatever it was he was being told to do." Lead counsel said that he had "[n]o doubt" that the petitioner was suffering from a mental illness. He said that he hired Doctor Keith Caruso to evaluate the petitioner in an unrelated case in which lead counsel was also representing the petitioner and that both Doctor Caruso and the State's expert determined that the petitioner "could rely on the defense of insanity" in that case. The trial court gave lead counsel 60 days in which to submit a report from Doctor Caruso in this case, which deadline Doctor Caruso said that he could not meet. Lead counsel received a draft report from Doctor Caruso "sometime in the middle of May of [20]09," which report lead counsel reviewed, annotated, and discussed with Doctor Caruso. Lead counsel's annotated copy of the May 2009 report is included in the record.

Lead counsel said that the petitioner's version of events reflected in Doctor Caruso's draft report was a version that lead counsel had "never heard . . . before." He said that he and his staff had met with the petitioner 44 times by that point and that the petitioner had provided a consistent version of events during those meetings, which version was inconsistent with the account he relayed to Doctor Caruso. Lead counsel said that he was concerned about the draft report because he wanted to ensure that it was accurate, agreeing that the credibility of the expert witness was central to the defense strategy. Lead counsel said that Doctor Caruso confirmed that the version of events recounted in his draft report reflected what the petitioner had told him.

Lead counsel said that Doctor Caruso submitted a second report on June 2, 2009, which report indicated that the petitioner had given an account of the offenses that conformed with the version that he had consistently given trial counsel. Lead counsel denied that he asked Doctor Caruso to change the report and denied that he told the doctor the version of events that the petitioner had told him. He said that he only told the doctor that the version of events in the May 2009 draft report was inconsistent with what the petitioner had told him. Lead counsel explained that the petitioner's version of events recorded in the May 2009 report indicated that he knew who the victim was and that he understood what he was doing at the time he killed her. The petitioner's version of events recorded in the June 2009 report, on the other hand, indicated that at the time of the offenses, he believed that he was in danger and that he killed the victim believing she was someone else there to attack him. Lead counsel said that after he told Doctor Caruso that the petitioner had given him a different version of events, Doctor Caruso said that he would re-interview the petitioner and "get to the bottom of that."

Lead counsel said that when he asked the petitioner why he had initially given Doctor Caruso a different version of events, the petitioner said that he had lied because the version that he had told to lead counsel "ma[d]e me seem like I'm crazy and I'm not. . . . . I don't want to be viewed by others as being crazy and a monster." The petitioner also told lead counsel that others at the jail had told him that

lead counsel "was selling me out, you cannot win with a not guilty by reason of insanity defense, and they've told me, 'You can't go to trial that way, you've got to come up with a version that makes you look less crazy and less a monster.'" Lead counsel said that he understood the report of June 2, 2009, to be Doctor Caruso's final report and that he provided a copy of the report to the State shortly after receiving it. Lead counsel noted that it was long past the deadline given by the court to submit the report.

Lead counsel testified that when he reviewed the June 2009 report, he knew that it did not reference the narrative of events in the May 2009 draft report but said that the omission did not concern him because he did not consider the May 2009 report to be anything more than a draft, noting that the doctor did not even sign the May 2009 report. He said that he "understood the June [2009] report to be the report that [Doctor Caruso] authorized me to file." He reiterated that Doctor Caruso "never authorized me to file the May [2009] report, it was never signed, it was inaccurate, it was a draft, it was submitted to me originally as a draft. I never saw it as a report." He acknowledged that the May 2009 report was not marked with the word "draft."

Lead counsel said that on September 16, 2010, Doctor Caruso issued a "psychiatric evaluation addendum." He explained that the doctor "would from time to time come back and update his evaluation by talking to [the petitioner]." Anytime Doctor Caruso "updated the report he called it an addendum." Doctor Caruso issued another addendum to his report on October 21, 2011.

Lead counsel said that the defense strategy was a "mental health defense" and that Doctor Caruso's testimony was "[c]ritical to that defense." He said that he met with Doctor Caruso "frequently over three years" leading up to the trial. He said that on the third day of trial, the State moved for the trial court to order the petitioner to produce Doctor Caruso's rough notes. Lead counsel told the prosecutor that he "didn't have them, I'd never seen them" but that he "would be glad to call [Doctor] Caruso and get them." Upon the request to produce his rough notes, however, the doctor was "'pushing back'" and said that he was "'not going to turn over his rough notes.'" When lead counsel told Doctor Caruso that the court had ordered his production of the notes, Doctor Caruso gave his hand-written notes to lead counsel who "turned them over [to the State] before I had read them."

When reading Doctor Caruso's notes in preparation for Doctor Caruso's testimony, lead counsel saw reference to the narrative of events that the petitioner had given in his first interview with the doctor, which information lead counsel found "shocking." Lead counsel said that he "was extremely angry" and asked Doctor Caruso where that information came from. When Doctor Caruso told lead counsel that he had given him the information "'in the report,'" lead counsel replied, "'I've never seen this in my life, and

you've never given it to me.'" At that point, lead counsel believed that Doctor Caruso was not being forthright with him and called several other attorneys and staff who had assisted in this case, all of whom said that they had not seen this information before. When an attorney located the May 2009 report that lead counsel had received from Doctor Caruso, lead counsel said that he "had no recollection of ever seeing that report." He knew that he was "in big trouble" in this case and that "[t]he defense was probably gone." Lead counsel said that as soon as he realized that he had the May 2009 report, he turned it over to the State as well.

Lead counsel said that the next day of trial, he requested an in-chambers conference with the trial judge and the prosecutor and that he contacted the BPR for ethical direction "to tell me how much of my predicament I could reveal to the [c]ourt in the presence of the" district attorney. He said that in the conference, he "was as vague as I could be to the judge, and to her credit, . . . she knew something was amiss." The trial court "gave me a day to try and sort through this to figure out what I was going to do next." Lead counsel said that he considered "scrap[ping] a mental health defense and we could defend on the facts" but decided that "that was a terrible option." The only other option that he saw, and the one that he believed to be "the least damaging," was to present "some collateral mental health testimony that we could rely on and hope that the damage to [Doctor] Caruso wouldn't be fatal."

Lead counsel said that he called Doctor Caruso to testify but that his testimony was not effective and that the doctor "was eviscerated" on cross-examination. He recalled that the State raised the issue of his changing the petitioner's narrative of events from the May 2009 report and implied that the doctor was not being truthful in his testimony. He said that it "appeared that we . . . tried to sneak one by and got caught." When asked whether, in his judgment, he was effective in his handling of this matter on behalf of the petitioner, lead counsel said, "No."

During trial, the State cross-examined Doctor Caruso about an academic impropriety that he had committed during medical school. Lead counsel said that he did not know until after the trial had begun that Doctor Caruso had committed "academic impropriety." He explained that he had used Doctor Caruso as an expert in other trials against other prosecutors from the same district attorney's office and that the doctor's past record "was never an issue with any of them." He acknowledged that he "should've known" about the doctor's past record but said that Doctor Caruso had "an unbelievably impressive Curriculum Vitae" and was "affiliated with a number of incredible institutions" that did not find his "academic improprieties . . . . to be debilitating." Lead counsel agreed that the State's raising the doctor's past academic improprieties at trial further damaged the doctor's credibility as a witness. He said that the State's use of the doctor's past record in this case was "[d]evastating."

Lead counsel testified that in preparation for trial, he learned that the petitioner had written letters "to various individuals" and that the victim had maintained a diary in which she indicated that she feared the petitioner because "he was crazy." He said that he moved for specific discovery of those items but that "[t]he State became angry with those motions and maintained to the [c]ourt that they knew what their duties were with regard to *Brady* and discovery and that they had complied." (italics added). In a subsequent in-chambers meeting with the prosecutor to unseal certain materials that had been returned to the court from a mental health facility, lead counsel learned that the State had provided the mental health facility with a copy of the letters and the diary entry and that it became obvious that the State had not "complied with their obligations" in discovery as they had alleged. The trial court held a hearing at which the prosecutor told the court that she had not turned over the letters because, had lead counsel "realized that we were monitoring the mail," he would have told the petitioner "to stop writing letters." The prosecutor also told the court that she did not turn over the petitioner's recorded jail telephone calls because lead counsel would have told the petitioner "to stop making phone calls." The trial court ordered the State to provide the defendant with the withheld letters and diary entry as well as "over a hundred[] telephone calls that they had recorded." Because lead counsel received this discovery only "a short time before trial," he "informed the [c]ourt that I wasn't going to listen to them, I didn't have time and that I would be ineffective if I didn't do that." The trial court limited the State to the use of only 10 recorded telephone calls at trial, and the State provided those calls to lead counsel.

Lead counsel said that "shortly before the November trial date I got a call from the [BPR] who said that they were looking into [the prosecutor] and that they wanted to ask me some questions." Lead counsel said that he did not discuss the BPR investigation with the petitioner because the investigation was confidential and because he had been instructed "not to share that with anyone." He acknowledged that he did not ask the BPR whether he could share the information with the petitioner. He said that he wrote three letters to the BPR as part of the investigation and acknowledged that the letters were in support of the prosecutor and that he did not tell his client about those letters.

Lead counsel recalled that during trial, State witness Doctor Rokeya Farooque testified that if the petitioner were found not guilty by reason of insanity, he would be released into the community. Lead counsel said that he did not object to that testimony because co-counsel was cross-examining the doctor and because "it's oftentimes troubling to have somebody else jump up and interject objections when it's your witness." He acknowledged that they should have objected to the testimony and that the statement "was prejudicial . . . . [a]nd she repeated it multiple times."

-7-

Lead counsel recalled that "very, very early" in the case, the trial judge brought to the attention of the parties that her nephew "was dating someone who worked at Barley's," the same restaurant where the victim worked. Lead counsel said that the petitioner was present in the court room when the judge "announced it from the bench" and that the petitioner asked lead counsel about it outside of the courtroom. Lead counsel said that he told the petitioner, "'Don't worry about it, we're in the court we want to be in.'" He said that the "exchange didn't last five seconds and was the last time that issue was ever addressed." Lead counsel said that he did not believe the issue was a conflict that he needed to address.

During cross-examination, lead counsel testified that he developed a mental health defense as a strategy before receiving Doctor Caruso's May 2009 draft report and that he did not see any other viable defense strategy. He said that Doctor Caruso had elite credentials and was on the Administrative Office of the Court's ("AOC") list of approved psychiatrists. He reiterated that Doctor Caruso had been recommended to him by "the Post[-]Conviction Defender Office" and that Doctor Caruso "was respected." Lead counsel acknowledged that he first learned of the petitioner's damaging version of events when he received Doctor Caruso's May 2009 report. He said that he did not have the option to hire a second expert to replace Doctor Caruso after the May 2009 report resurfaced during trial because the AOC would not have paid for it. He acknowledged that the AOC had previously accommodated his requests for a new expert witness when the first one did not work out but said that he had never requested a new expert "because I didn't like the opinion that I got." He said that even if he had received the funds for a new expert, he would "be in a difficult ethical position" concerning Doctor Caruso's damaging report.

Lead counsel acknowledged that the petitioner's lying to Doctor Caruso put the defense "in a position that [we] couldn't get out of at that point" but said that "the mistakes that I made compounded that" problem. He acknowledged that even if he had remembered the damaging information in Doctor Caruso's first report before trial, he "would've still had the same dilemma" but asserted that "[i]t would've been better had I discovered it sooner." He acknowledged that at trial Doctor Caruso was able to explain why he believed the petitioner's first narrative of events to be false but said that the doctor's testimony was in "the context of the guy tried to sneak one by us and now he's being caught and now he's trying to explain it away versus had we addressed it in the original first report in June or addendums." Lead counsel said that the jury may have "seen it differently had he been and I'd been forthcoming about that early on." He reiterated "that the perception in the courtroom was that I had tried to sneak one by and [Doctor] Caruso had and we'd been caught in the middle of the trial." Lead counsel said that if he had remembered earlier the existence of the May 2009 report and had realized that it had not been referenced or explained in the June 2009 report, he would have "start[ed] with getting a new expert" then

determined "how much of [Doctor] Caruso's work do you have to share with the new expert. And depending on the answer that you reach in that analysis, you may be in no different -- you may be in a box you can't get out of." He also said that had he remembered the contents of the May 2009 report he could have had Doctor Caruso "own that and have it show up in every report after that and have [Doctor] Caruso deal with why he believes that not to be an accurate statement and how it's consistent with someone who suffers from schizoaffective disorder." Lead counsel added that the way that he "handled" the May 2009 report was "all in the context of me believing that that information was a lie. It can't go in a report."

Lead counsel acknowledged that in addition to Doctor Caruso's testimony, at least four other expert witnesses testified that the petitioner suffered from psychoses or some mental disease. He also acknowledged that the fact that the petitioner suffered from a mental health disorder was not at issue; the contention arose about whether the petitioner appreciated the wrongfulness of his actions.

Lead counsel said that he knew of Doctor Caruso's having altered data for a research project while in medical school before he called Doctor Caruso to testify but that he did not expect the trial court to allow that information into evidence because it occurred over 20 years prior and was highly prejudicial. He also said that, at the time, he believed that "in light of [Doctor Caruso's] accomplishments post graduate," the negative impact of that information would be minimal if admitted.

Lead counsel reiterated that he believed BPR investigations to be confidential and responses to BPR inquiries to be mandatory. He said that he believed the prosecutor's failing to give him the petitioner's letters and recorded telephone calls was a discovery issue and not an ethical one. He also said that he received the withheld materials in February 2011, nine months before the November 2011 trial and that because the trial court limited the State to using only a few of the recorded telephone calls, he had time to review all of the materials before trial. Lead counsel said that he did not believe the discovery violation by the State to be prejudicial at trial because he had time to review the materials and because the State ended up using none of the recorded telephone calls. He said that the BPR contacted him about the investigation into the prosecutor "maybe three weeks before we went to trial." Upon request by the BPR, lead counsel sent them the transcript of the hearing in which the prosecutor admitted to withholding evidence to gain a tactical advantage. He said that he was "troubled by the fact that [the prosecutor] had stated in open court that she had complied with her obligations" under the rules of discovery and *Brady* when she had not provided lead counsel with the materials she sent to the mental health facility, but he acknowledged that in a letter to the BPR, he said that he "did not believe that [the prosecutor] was unethical. I did not believe that she would willingly lie to a judge and I told the Board that." He clarified that he believed that he and

the prosecutor disagreed as to the meaning of the discovery rule and that the prosecutor had explained that she knew of her duty to produce the information but argued that the rule did not require her to provide it as soon as she came to possess it. Lead counsel said that the BPR investigation was disconnected from his relationship to the petitioner and his handling of the case. He said that it never occurred to him to move to disqualify the prosecutor or the entire district attorney's office and noted that the petitioner may not "have been in any better position in terms of the abilities of the prosecutor" if he had moved for disqualification. He also said that he "didn't see that [the petitioner] was suffering by my unwillingness or my failure to move to disqualify her."

Lead counsel recalled that the State called Doctor Farooque as a rebuttal witness to Doctor Caruso. Lead counsel acknowledged that Doctor Caruso had testified that if found not guilty by reason of insanity, the petitioner could be committed to a mental health facility indefinitely but emphasized that Doctor Caruso had been discredited as a witness. He acknowledged that eliciting the testimony from Doctor Caruso was a strategic decision to discourage the jury from thinking that if they found the petitioner not guilty by reason of insanity, he would be released into the community despite his mental health issues. Lead counsel acknowledged that he did not always object to every objectionable issue at trial so as not to draw attention to damaging information. In this case, however, lead counsel "thought the judge would give a curative instruction" regarding Doctor Farooque's testimony, but he acknowledged that he did not ask for one, explaining that he did not think that he needed to ask for one because the error "was so clear."

Lead counsel said that he would not have achieved a different outcome at trial if the trial judge had recused herself to avoid a potential conflict of interests. He also said that he did not believe that the potential conflict affected the trial judge's conduct or decisions during trial.

On redirect examination, lead counsel testified that the "way to deal" with Doctor Caruso's credibility issue was to have him reference the petitioner's changed narrative in his subsequent reports and explain why he believed the damaging narrative to be untruthful. Lead counsel said that he believed such an action could have mitigated the credibility issue.

Co-counsel testified that he joined the petitioner's defense team in August 2011, three months before trial. He said that when he joined the team, he reviewed Doctor Caruso's latest report and that "it was very long and . . . even though it mentioned there were other reports, it seemed like a stand-alone document." He understood that "[e]verything was contained in that one long report" and that he did not need to review the draft report. He said that because insanity was the only defense in this case, Doctor Caruso's credibility was vital. Co-counsel said that his role at trial was "[h]andling the

experts" and noted that he questioned all except one of the expert witnesses at trial. He said that in the middle of the trial, the trial court ordered the petitioner to provide Doctor Caruso's rough notes to the State and that lead counsel coordinated getting the notes from the doctor. Co-counsel said that he met with Doctor Caruso prior to trial and believed him to be a credible witness; co-counsel acknowledged that he did not know about Doctor Caruso's academic misconduct at that time, saying that he did not find out about it until the middle of trial. Co-counsel explained that he did not think that Doctor Caruso's past misconduct "standing alone . . . would've been that big of an issue" but that it negatively impacted his credibility when combined with the late discovery of his rough notes.

Co-counsel recalled first reading Doctor Caruso's rough notes on a Friday evening after the trial had begun and realizing that "there was . . . a problem" because the version of events that the petitioner "had first told [Doctor Caruso] was completely different" than the version "in his report and basically it did away with any insanity defense." Co-counsel asserted that had Doctor Caruso addressed the changed narrative in his final report, the issue would not have damaged the doctor's credibility as an expert witness. He acknowledged that the way that the issue arose at trial gave the appearance that the defense team and Doctor Caruso were trying to hide evidence. Co-counsel said that "it was awful" and agreed that Doctor Caruso "was eviscerated" during cross-examination. He believed that Doctor Caruso had no credibility with the jury by the end of his testimony. Co-counsel testified that he believed that the correct professional and ethical course of action was for lead counsel to have ensured that Doctor Caruso's final report and addendums addressed the May 2009 report and the petitioner's changed narrative. He said that no one on the defense team disputed that they had made a mistake in handling Doctor Caruso's reports.

Co-counsel acknowledged that he did not object to Doctor Farooque's testifying that the petitioner could be released into the community if found not guilty by reason of insanity and explained that he did not realize until after trial that "what she had testified to was inappropriate." He said that he raised the issue in the motion for new trial but was limited to plain error review. He acknowledged, "I should have known and should have objected."

During cross-examination, co-counsel acknowledged that "[t]he physical proof that [the petitioner] was the one" who committed the offenses "was overwhelming" and that insanity was the only plausible defense. He also acknowledged that all of the experts, including the State's witnesses, agreed that the petitioner suffered from a mental disease or defect.

Co-counsel laid out the timeline of events, saying that jury selection began on November 7, and the State rested its case-in-chief on November 11, a Friday. He

-11-

received Doctor Caruso's rough notes that Friday evening and had the weekend to review them and consider how to deal with the petitioner's false narrative and Doctor Caruso's credibility. On Monday, November 14, the parties had an in-chambers conference with the trial court that led to the court's granting the petitioner a one-day continuance. Co-counsel said that they decided to call Doctor Caruso to testify "because we had nothing else," and on direct examination, Doctor Caruso explained his omitting any reference to the May 2009 report in his future reports. Co-counsel acknowledged that Doctor Malcolm Spica's neuropsychological test supported Doctor Caruso's explanation for why he believed the petitioner's first narrative of events was false but explained that Doctor Caruso "was the only one who could say that for this crime [the petitioner] fit the insanity test"; the other evidence was "background" and "supporting stuff." He acknowledged that he expected Doctor Farooque to testify that the petitioner understood the wrongfulness of his conduct at the time of the offenses and that he was relying on Doctor Caruso's testimony to counter that evidence.

Co-counsel said that he elicited testimony from Doctor Caruso on direct examination that if found not guilty by reason of insanity, the petitioner would be committed to a psychiatric facility to alleviate any concerns of the jury that the petitioner "would get out the door tomorrow." "[W]e thought it was necessary to let them know that that's not how it works, that he doesn't just get let out, that there's this other process." He acknowledged that he understood Doctor Farooque's testimony that the petitioner "was not committable" was in response to Doctor Caruso's testimony but reiterated that he was not aware at the time that it was objectionable.

Upon questioning by the court, co-counsel testified that he believed the petitioner lied to Doctor Caruso in his first narrative of events because the petitioner had read an article stating that no defendant had been successful in presenting an insanity defense "in the entire state" since a change in the relative law.

Doctor Katherine Rae Smith testified at the post-conviction evidentiary hearing as an expert in forensic psychology. She said that when "doing a court ordered evaluation, it's expected that I'm going to prepare a report, that's just part of the job." She said that if she is "retained by defense counsel, then I complete my evaluation and report findings to the attorney. And I typically wait to be asked to prepare a report." She explained that attorneys do not always "want a report because there's not anything that they expect to use."

Doctor Smith said that in this post-conviction case, she was retained to review certain materials, including "the trial transcript and mental health records that were relied upon in the evaluation and records of the evaluation reports that were produced" for trial, including Doctor Caruso's May 2009 report. She said that it was her practice to "give

a draft report labeled draft and then . . . ask the attorney to review it, and if there are factual areas or typos or problems to inform me of those so that I can make it accurate." She then would "wait to be asked for a final report." She said that, on occasions, attorneys have "disclosed my draft reports, which I don't like that, but I don't have any control over that."

Doctor Smith testified that Doctor Caruso violated the professional standards of the American Psychological Association by failing to incorporate the May 2009 report into his subsequent reports, noting that Doctor Caruso's omission "was misleading." She explained that "it's okay to have new data, but he completely omitted it from anything that he produced after the initial report. And it gave the appearance that the version that was included in the later reports was the only version." She said that had a new psychologist taken over the case, Doctor Caruso would have been ethically obligated to turn over the draft report of May 2009. She said that in her professional opinion, Doctor Caruso should have incorporated the changed narrative into his reports; "[i]t could not be ignored." She opined that "the way to communicate that would be to just describe the process or the progression of data and to spell out why he felt that the later version, the second version, . . . was more compelling or more persuasive." She believed that Doctor Caruso's omission in his later reports damaged his credibility, which she said was a hallmark of an expert witness.

During cross-examination, Doctor Smith testified that in Doctor Caruso's May 2009 report with the petitioner's first narrative of events, Doctor Caruso concluded that the petitioner suffered from a mental disease and that he could not appreciate the wrongfulness of his actions. She acknowledged that Doctor Caruso's opinion as to the petitioner's insanity did not change with the petitioner's changed narrative but said that "the story matters" and "is contextualized." She agreed that the petitioner's changed narrative was relevant to Doctor Caruso's professional conclusions. She said that she did not believe "that you can have a fair fight about [the petitioner's] knowledge of wrongfulness" at the time of the offenses "without a solid evaluation" by the petitioner's expert, "not a messy unprofessional, incomplete evaluation that got exposed during the trial."

The State exhibited to the hearing an affidavit of Lacey Wilber, General Counsel for the AOC, and the AOC's records showing that Doctor Caruso had been used as an expert witness numerous times since the petitioner's trial.

At the close of the hearing, the post-conviction court asked the parties to submit supplemental briefs to further address the issue of whether lead counsel would have had an obligation to disclose Doctor Caruso's May 2009 report to a subsequent expert witness had he hired one.

The post-conviction court issued an order denying post-conviction relief on February 26, 2019. In its order, the post-conviction court addressed only the issues of whether trial counsel performed deficiently in their selection of Doctor Caruso as an expert witness and in their handling of the May 2009 report. The post-conviction court found that although Doctor Caruso's "testimony was of vital importance to the defense, his testimony was far from the only evidence presented" in support of his insanity defense. The court also found that "trial counsel were diligent in their selection of D[octor] Caruso as an expert" and that the petitioner's "alternate narrative" of events given to Doctor Caruso "burdened" his defense "with this narrative whether through the testimony of D[octor] Caruso, the advocacy of trial counsel, or through a successor to one or both."

The petitioner timely appealed the post-conviction court's denial of relief, and this court concluded that the post-conviction court's findings of fact and conclusions of law were inadequate to facilitate meaningful review, reversed the post-conviction court's judgment, and remanded the case to the post-conviction court for an order addressing all of the issues raised in the amended post-conviction petition. *Micah Ross Johnson*, slip op. at 13-14.

On remand, the post-conviction court entered a new order on February 22, 2021, denying post-conviction relief and "incorporat[ing] by reference the content and findings set forth in the [c]ourt's Final Order" of February 26, 2019. In its February 2021 order, the post-conviction court found that the trial court had "properly advised the parties that a potential conflict of interest[s] existed," that "the witness who created the potential conflict was never called at trial," and that the petitioner failed to show that he was prejudiced by the "tangential and ultimately unrealized" conflict. As to lead counsel's failure to apprise the petitioner of the BPR investigation against the prosecutor, the post-conviction court found that the petitioner failed to show that he was prejudiced by counsel's action. The court also found that lead counsel's participation in the BPR's investigation amounted to his being "a fact witness" and did not create an actual or potential conflict of interests. Finally, the post-conviction court found that the petitioner failed to establish that trial counsel's failure to object to testimony that the petitioner "'was not commit[t]able to a mental health facility'" prejudiced his defense.

In this timely appeal, the petitioner reasserts the claims raised in his amended post-conviction petition.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.*

-14-

§ 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

*Doctor Caruso*

The petitioner asserts that trial counsel performed deficiently by relying on Doctor Caruso as an expert witness and by "failing to select and vet a credible expert witness to support [his] insanity defense." Additionally, the petitioner argues that trial counsel should have discovered that Doctor Caruso's initial, damaging report was not referenced or included in his later report, positing that trial counsel's conduct destroyed

-15-

Doctor Caruso's credibility and destroyed his sole defense of insanity.

Generally, the selection of an expert witness lies within the sound discretion of trial counsel. *See Kendrick*, 454 S.W.3d at 475. Here, the evidence established that lead counsel selected Doctor Caruso from a list of experts approved by the AOC based on the recommendation of other experienced attorneys who had used Doctor Caruso's services. Lead counsel also reviewed Doctor Caruso's curriculum vitae and determined that he had elite credentials in his field. Although Doctor Caruso acknowledged at trial that he had committed academic misconduct in medical school, that misconduct did not appear to have impeded Doctor Caruso's excelling in his career. The petitioner has failed to establish that trial counsel performed deficiently in his selection of Doctor Caruso as an expert witness. The petitioner put on no evidence that trial counsel would have elected not to use Doctor Caruso's services had he known about the doctor's 20-year-old act of academic misconduct. Lead counsel testified that he did not expect the trial court to admit the doctor's misconduct into evidence, and co-counsel testified that the academic misconduct alone was likely insufficient to render the doctor's testimony incredible. Because trial counsel indicated that they did not believe that the doctor's academic misconduct would be an issue at trial, it is unlikely that they would have forgone his services on that ground alone.

Trial counsel did, however, perform deficiently in their handling of Doctor Caruso's May 2009 report. The record establishes that lead counsel knew of and was in possession of Doctor Caruso's May 2009 report and the petitioner's damaging narrative of events two years before trial. That lead counsel believed the May 2009 report to be only a draft does not excuse his neglect in forgetting about the petitioner's changed narrative or in failing to notice the omission of any reference to that narrative in the June 2009 report. The information contained in the May 2009 report was damaging to the petitioner's defense, and trial counsel did nothing in advance of trial to mitigate that damage. Furthermore, counsel did nothing to mitigate the damage posed to Doctor Caruso's credibility by his omission of the changed narrative in his subsequent reports.

Although the post-conviction court found that the jury would have heard the damaging narrative of events regardless of what trial counsel had done, whether the jury heard the evidence was not the only potential prejudice posed by counsel's actions. The petitioner argues, and the post-conviction court did not address, that trial counsel's failure to realize Doctor Caruso's omission of the changed narrative in his June 2009 and subsequent reports caused Doctor Caruso to appear incredible to the jury. Although Doctor Caruso addressed the omission in his testimony, trial counsel testified that they could have mitigated the damage to Doctor Caruso's credibility by pointing out the omission to Doctor Caruso and having him include a reference to the May 2009 report and the petitioner's changed narrative in his subsequent reports. Doctor Caruso's subsequent reports could

-16-

also have provided his professional opinion as to why the petitioner's first narrative of events was untruthful.

The trial transcript shows that on direct examination, Doctor Caruso explained that the petitioner had given him a false version of events and told the doctor that he lied because "voices" or "other inmates told me not to tell you the truth." Doctor Caruso also testified that the petitioner told him that he had lied in his first narrative of events because he did not want to "look like a monster." Doctor Caruso explained that the petitioner admitted to lying in his first interview and that he did not believe the petitioner's first account of the events. Although the jury heard Doctor Caruso's explanations, the State used Doctor Caruso's omission of the changed narrative in his subsequent reports to attack his credibility.

When the State cross-examined Doctor Caruso at trial, he read into the record portions of his hand-written notes of his interviews with the petitioner. The State attacked Doctor Caruso's credibility by raising the discrepancies in word choice between his hand-written notes and his typed reports. The State also raised the fact that the June 2009 report contained no reference to the May 2009 report or the changed narrative, and Doctor Caruso explained that he should have labeled the June 2009 report an addendum and that it "was an error" to not reference the May 2009 report in the subsequent reports. Doctor Caruso also testified that it was his understanding that the May 2009 report was not a draft and that he believed that the State had received it with discovery materials; he said that he was "not trying to suppress anything." He pointed out that in all of the reports, he noted that he had interviewed the petitioner on October 9 and 10, 2008, which interviews formed the basis of his May 2009 report. The State also impeached Doctor Caruso with his having "altered data on a med[ical] student research project" when he was in medical school in the late 1980s. Doctor Caruso explained that he never published the manipulated data and graduated the following year and that the misconduct "hasn't been an issue the rest of my career."

In closing arguments at trial, the State argued that, for the jury to find the defendant not guilty by reason of insanity, they had to believe Doctor Caruso's testimony. The State went on to argue that Doctor Caruso's failure to incorporate the May 2009 narrative of events into his subsequent reports conveniently supported the petitioner's insanity defense. The State also emphasized that Doctor Farooque, in contrast to Doctor Caruso, had conducted a thorough and open-minded investigation and had concluded that the petitioner could appreciate the wrongfulness of his conduct at the time of the offenses.

The State argues that the petitioner has failed to establish that he was prejudiced by counsel's actions, asserting that the jury convicted the petitioner on the basis of the narrative of events contained in the May 2009 report and that the jury would have

heard that evidence regardless of counsel's conduct. The State also argues that other evidence, namely testimony from the petitioner's father and stepmother and an entry from the victim's diary, supported the petitioner's insanity defense. Additionally, the State points out that evidence from Doctor Malcolm Spica indicated that the petitioner "would likely only be violent during a state of psychosis" and that another doctor had determined that the petitioner could not appreciate the wrongfulness of his actions when he committed an assault in an unrelated case. As the petitioner points out, however, the fact of the petitioner's suffering from a mental disease or defect was not at issue. The only point of disagreement was whether the petitioner could understand the wrongfulness of his actions during the offenses in this case. That the petitioner was deemed insane in an unrelated case does not speak to whether he was insane at the time of the offenses in this case. Moreover, that the petitioner may have been violent only during a state of psychosis does not speak to whether the petitioner could understand the wrongfulness of his actions during such a psychotic state. Therefore, Doctor Caruso was the only defense witness who could speak to the ultimate issue of whether the petitioner understood the wrongfulness of his actions at the time that he killed the victim.

Because insanity was the petitioner's sole defense and because, as the State pointed out in its closing argument, Doctor Caruso's credibility was vital to that defense, we conclude that trial counsel's deficient performance in dealing with the May 2009 report damaged Doctor Caruso's credibility "sufficient[ly] to undermine [our] confidence in the outcome" of the case. *See Strickland*, 466 U.S. at 694. Consequently, the judgment of the post-conviction court is reversed and the case is remanded for a new trial.

To facilitate further review, we will address the petitioner's remaining issues

*BPR Investigation*

As to the petitioner's assertion that lead counsel should have disclosed to the petitioner that the BPR was investigating the prosecutor for her handling of discovery materials in his case, the petitioner has failed to establish that he is entitled to post-conviction relief on this ground. First, lead counsel testified that he maintained the confidentiality of the investigation as he was ordered to by the BPR, and the rules governing the BPR's investigations required lead counsel to keep the investigation and his correspondence with the BPR confidential. Tenn. Sup. Ct. R. 9, § 32.1 ("All matters, investigations, or proceedings involving allegations of misconduct by . . . an attorney, including all information, records, minutes, correspondence, files or other documents of the Board . . . shall be confidential and privileged . . . ."). The petitioner has not shown that lead counsel performed deficiently by following the rules of the BPR. Furthermore, the petitioner has not shown that having the prosecutor removed from his case would have changed the outcome of the trial and has not shown that his knowledge of the investigation

-18-

would have changed his trial strategy in any way. He is not entitled to relief on this ground.

*Trial Court's Conflict of Interests*

The petitioner also argues that trial counsel were ineffective by not seeking the recusal of the trial judge because of a potential conflict of interests. The record establishes that the trial judge disclosed the potential conflict and that trial counsel made a strategic decision not to seek the judge's removal from the case. This is precisely the sort of strategic decision that is left to the sound discretion of trial counsel. *See Adkins v. State*, 911 S.W.2d at 347. Moreover, the petitioner has failed to show that the he was prejudiced by counsel's failure to seek the judge's recusal. The witness with whom the trial judge had a potential conflict was not called to testify at trial, and the petitioner has not shown that he would have achieved a different outcome had he had a different trial judge.

*Failure to Object*

Next, the petitioner argues that trial counsel performed deficiently by failing to object to Doctor Farooque's testimony that the petitioner would not be committable to a mental health institution if he were found not guilty by reason of insanity and by failing to preserve the issue for appellate review. The petitioner has failed to establish that he was prejudiced in this matter. Lead counsel testified that, although he should have objected to the statement, he did not object because co-counsel was cross-examining Doctor Farooque and that he did not want to interrupt or distract co-counsel. Co-counsel testified that he did not realize that the testimony was inappropriate and objectionable at the time. Even if trial counsel had objected and the trial court had struck Doctor Farooque's statement, the petitioner has not shown that he would have achieved a different outcome in this case. The trial court instructed the jury: "A verdict of *'not guilty by reason of insanity'* shall result in the automatic detention of the [d]efendant in a mental hospital or treatment center pending further medical and legal findings." (italics in original). The trial court also instructed the jury to decide the case "only after an impartial consideration of the evidence" and to "have no prejudice or sympathy or allow anything but the law and the evidence to have any influence upon your verdict. You must render your verdict with absolute fairness and impartiality as you think justice and truth dictate." The jury is presumed to have followed these instructions, *see State v. Kiser*, 284 S.W.3d 227, 272 (Tenn. 2009) (citing *State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008)), and the petitioner presented no evidence to the contrary.

*Cumulative Error*

Finally, the petitioner argues that he is entitled to post-conviction relief because of the cumulative effect of trial counsel's errors. Because the petitioner has

established only one instance of trial counsel's deficient performance, we need not consider the aggregate prejudicial effect of counsel's conduct.

Accordingly, the judgment of the post-conviction court is reversed and the case is remanded for a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE